UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

LORENZO TOWNSEND,

                Plaintiff,

v.

MARGARET A. OUELLETTE et al.,

                Defendants.

_____/

Case No. 1:17-cv-935

Honorable Paul L. Maloney

## <u>OPINION</u>

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Ouellette, Davis, and Russell. The Court will serve the complaint against Defendants Leach, Curley, and Johnson.

## Discussion

### I.    Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan. The events about which he complains occurred at that facility.  Plaintiff sues LCF Doctor Troy Davis, LCF Physician's Assistant Margaret A. Ouellette, MDOC Special Activities Coordinator David M. Leach, MDOC Assistant Deputy Director John Curley, MDOC Administrator Daphne M. Johnson, and MDOC Grievance Section Manager Richard D. Russell.[1]  Each Defendant is sued in his or her individual and official capacity.

Plaintiff's claims center on his health care and his Buddhist faith.  He claims that the Defendants have refused to accommodate his adherence to that faith with respect to his diet and his healthcare.

Defendant Ouellette saw Plaintiff on January 6, 2016.  Plaintiff claims Defendant Ouellette:

(1)    denied treatment for sleep apnea with full knowledge of the potential for serious physical injury or possible death from oxygen deprivation;

(2)    denied or discontinued treatment for a vitamin B-12 deficiency resulting from strict adherence to Plaintiff's religious diet;[2]

(3)    refused to permit Plaintiff to purchase dietary supplements to remedy the deficiency;

---

[1] Although Plaintiff names Richard D. Russell as a defendant, Plaintiff makes no allegations against him.  The grievances attached to Plaintiff's complaint do not reference Defendant Russell.

[2] Plaintiff reports that his Buddhist faith does not permit him to ingest any item that contains "animal or animal by-products."  (Universal Life Buddhism Canon & Tenets of Adherence, ECF No. 1-1, PageID.60.)  Strict vegan diets carry a risk of certain nutritional deficiencies, including a vitamin B-12 deficiency.  *See Moore v. Cucchi,* No. 09-2217 (JAP), 2011 WL 4594907, at *1 (D.N.J. Sept. 30, 2011); *McKennie v. Tex. Dept. of Criminal Justice,* No. A-09-CA-906-LY, 2011 WL 7274536, at *1 (W.D. Tex. May 10, 2011); *Acoolla v. Angelone*, No. 7:01-CV-01008, 2006 WL 938731, at *4 (W.D. Va. Apr. 10, 2006).

(4)     refused to provide the PSA blood test to screen for prostate cancer, insisting that Plaintiff undergo a digital examination which violated his religious beliefs; and

(5)     refused to submit a request to Corizon Healthcare for treatments, at Plaintiff's expense, that conform to his religious beliefs.

(Compl., ECF No. 1, PageID.7-8.)  Plaintiff claims Defendant Ouellette was motivated, at least in part, by animus against Plaintiff's Buddhist beliefs.

About one year later, on January 15, 2017, Defendant Davis saw Plaintiff.  (*Id.*, PageID.8.)  Plaintiff informed Defendant Davis that Plaintiff was a strict Buddhist.  On January 19, 2017, Defendant Davis put Plaintiff on call for a blood draw to assess Plaintiff's vitamin B-12 level.  On February 1, 2017, Defendant Davis informed Plaintiff that his vitamin B-12 level was normal.  On March 29, 2017, Plaintiff received a copy of the blood test that Plaintiff contends showed that his vitamin B-12 level was not within the normal range; rather, it was low.

Plaintiff alleges that he is required to purge and clarify his physical temple of all impurities by anointing with sacramental oils.  (*Id.*, PageID.9.)  The oils must be free of alcohol and animal byproducts.  The MDOC policy directives do not permit inmates to possess religious oils in their cells.  Plaintiff sought an accommodation so that he could use sacramental oils that are non-flammable and non-toxic for purging and clarification of his spiritual temple in his cell.  (March 23, 2015 Letter, ECF No. 1-1, PageID.47.)[3]

Plaintiff alleges that the request was denied for lack of authority by LCF Warden Hoffner.  (Compl., ECF No 1, PageID.9.)  Plaintiff's request sought permission to possess and use

---

[3] Plaintiff also requested that the prison permit him to purchase his own vitamins that were free of animal byproducts from an outside vendor.  Warden Hoffner forwarded that request on to LFA Business Manager Pat Popoff.  Ms. Popoff informed Plaintiff that because multivitamins were listed on the standardized store list, they could only be purchased from the store and could not be purchased from an outside vendor.  Nonetheless, Ms. Popoff informed Plaintiff that she would forward his concern to the Central Office.

the religious oils. MDOC Policy Directive 05.03.150 (Eff. 9/15/2015) directs the prisoner to submit a request to possess religious property not previously authorized to the warden. The warden does not have authority under the policy directive to grant or deny the request. The warden simply forwards it on to the CFA Special Activities Coordinator. The CFA Special Activities Coordinator, in turn, forwards the request on to the Deputy Director. The Deputy Director makes the final decision. Thus, Warden Hoffner sent the request to Defendant Leach. Defendant Leach submitted the request to Defendant Curley. Defendant Curley denied the request because the oils were toxic and because Plaintiff could meditate without the oils using other items of religious property—mala beads and a picture of the Buddha. (Memorandum, ECF No. 1-1, PageID.52.) Defendant Leach communicated the denial to Warden Hoffner and Plaintiff.

Plaintiff sought a declaratory ruling from MDOC Director Heidi Washington under Michigan Adminstrative Rule 791.1115 regarding the vitamins and the oil. (Pet. for Declaratory Ruling, ECF No. 1-1, PageID.69-71.) Director Washington apparently designated Defendant Johnson to reply. By letter dated September 2, 2016, Defendant Johnson informed Plaintiff that Defendant Curley had resolved the oil request as required by policy. (Sept. 2, 2016 Letter, ECF No. 1-1, PageID.68.) She further informed Plaintiff that his request regarding the vitamins had been forwarded to the Correctional Facilities Administration for additional review. (*Id.*) Plaintiff does not indicate whether he ever received a response from CFA. Defendant Johnson told Plaintiff he could interpret a failure to respond as a denial of his request.

Plaintiff contends that Defendants Davis and Ouellette have been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, have violated his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42

U.S.C. § 2000cc-1(a)(1)-(2), have violated his First Amendment free exercise rights, and his Fourteenth Amendment equal protection rights.

Plaintiff claims that Defendants Leach and Curley have substantially burdened his religion in violation of the First Amendment by denying Plaintiff religious oils and refusing to permit him to purchase vitamins free of alcohol and animal byproducts from an outside vendor. Plaintiff argues that all defendants have violated the RLUIPA by denying Plaintiff religious oils and refusing to permit him to purchase vitamins free of animal byproducts from an outside vendor.

Finally, Plaintiff contends the Defendants' conduct violates the Religious Freedom Restoration Act of 1993 (RFRA).

Plaintiff asks the Court to enter declaratory and injunctive relief permitting him to purchase religious oils and vitamins and ordering an EKG and stress test as well as the PSA blood test. Plaintiff also asks the Court to award compensatory damages of $50,000.00 and punitive damages of $35,000.00 against each Defendant.

## II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff claims that Defendants have violated his rights under the First, Eighth, and Fourteenth Amendments as well as RLUIPA and RFRA.

### III. Defendant Russell

It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Frazier v.*

*Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant)); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries."). Plaintiff fails to attribute any action or inaction to Defendant Russell in the body of his complaint. His allegations fall far short of the minimal pleading standards under FED. R. CIV. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

Because Defendant Russell is identified as the manager of the grievance section of the MDOC, it appears likely that Plaintiff is suing Russell for his role in responding to one of Plaintiff's grievances.[4] Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability

---

[4] Although the Court can conceive of no other connection between Defendant Russell and Plaintiff's claims, based on Plaintiff's allegations and the documents he attached to his complaint, it does not appear that Defendant Russell had a hand in resolving the grievances that Plaintiff filed with respect to the issues raised in his complaint.

may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendant Russell did anything more than respond to grievances; thus, Plaintiff has failed to allege that Defendant Russell engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against him.

## IV. Deliberate indifference to serious medical need

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. CONST. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's

affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

A.     The PSA test

Plaintiff contends that Defendants Davis and Ouellette were deliberately indifferent to his serious medical needs when they offered only a digital examination for diagnosis of possible prostate problems, rather than the PSA blood test. Plaintiff has failed to identify any medical condition posing a substantial risk of serious harm to satisfy the objective component of his deliberate indifference claim.

Plaintiff's allegations also fall short with respect to the subjective component. Plaintiff does not allege any facts the awareness of which would permit an inference that serious harm might befall Plaintiff if he did not undergo the PSA blood test.[5]  Indeed, Plaintiff does not

---

[5] To the contrary, Plaintiff was born in 1971. At his age, the American Urological Association does not recommend routine PSA screening:

claim he suffered any symptoms of prostate problems at all, either before or after his consultations

with these Defendants. Absent such facts, Plaintiff cannot show that Defendants Davis or

Ouellette actually drew the inference as required to satisfy the subjective component.

Alternatively, Plaintiff's claim fails because the PSA blood test is not a treatment;

it is a diagnostic test. The *Estelle* Court foreclosed the possibility of a deliberate indifference claim

based on failure to pursue a particular diagnostic test:

> [T]he question whether an X-ray or additional diagnostic techniques . . . [are]
> indicated is a classic example of a matter for medical judgment. A medical decision
> not to order an X-ray, or like measures, does not represent cruel and unusual
> punishment. At most it is medical malpractice . . . ."

*Estelle*, 429 U.S. at 107. Here, Defendants Davis and Ouellette decided not to order a PSA blood

test. Under *Estelle*, that decision cannot rise to the level of an Eighth Amendment violation.

B. <u>Sleep apnea</u>

Plaintiff also contends that Defendant Ouellette refused to treat Plaintiff's sleep

apnea. (Compl., ECF No. 1, PageID.8.) Because Ouellette refused to treat the condition, Plaintiff

claims he was subjected to conditions that could elevate his blood pressure. (*Id.*) The MDOC

administrative grievance Plaintiff filed against Defendant Ouellette provides an important

additional fact that he left out of his complaint: the MDOC was treating Plaintiff's condition with

---

While the evidence of benefit of screening of men age 40 to 55 years indicates that the effect size is
marginal at best . . . the weight and quality of the evidence demonstrating the harms of screening
remains high. Effectively, the Panel concluded that the harms of screening in this population were
at least equal to the benefits, if not higher and, to this end, recommends that screening should not
be routine practice.

American Urological Association, *Early Detection of Prostate Cancer: AUA guideline*
http://www.auanet.org/guidelines/early-detection-of-prostate-cancer-(2013-reviewed-and-validity-confirmed-2015)
(last visited Dec. 20, 2017).

medication. (Grievance, ECF No. 1-1, PageID.16)[6] ("I['m] being denied the CPAP[machine;] the health [care providers] prefer to give me medication that cause[s] side effect[s].").[7]

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if considerable suffering results from the allegedly inadequate course of treatment. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant

---

[6] Under Federal Rule of Civil Procedure 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir.1997), *overruled on other grounds*, *Swierkiwica v. Sorema, N.A.*, 534 U.S. 506 (2002). Based on Rule 10(c), the Court has considered grievances attached to a prisoner's complaint as part of the pleading. *See, e.g., Rice v. Stouffer*, No. 1:14-cv-81, 2015 WL 1481536, at *3 (W.D. Mich., Mar. 31, 2015).

[7] CPAP stands for constant positive air pressure. *Keel v. City of Hopkinsville*, No. 97-5479, 1997 WL 809916, at *1 (6th Cir. Dec. 16, 1997).

received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2013) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

Plaintiff has failed to demonstrate that denial of a CPAP machine amounted to no treatment at all. Indeed, Plaintiff does not allege any serious consequence from the denial of the CPAP machine almost two years ago. Where Plaintiff indicates he was already being treated for sleep apnea with medication, Defendant Ouellette's refusal to also treat the condition with a CPAP machine does not rise to the level of deliberate indifference to a serious medical need.

C. Vitamin B-12 prescription

Finally, Plaintiff contends that Defendants Davis and Ouellette were deliberately indifferent to Plaintiff's serious medical needs when they failed to address an alleged vitamin B-12 deficiency with a prescription for vitamins. A grievance that Plaintiff attaches to his complaint reveals that his vitamin B-12 prescription was apparently discontinued in 2012, four years before his appointment with Defendant Ouellette and five years before his consultations with Defendant Davis. (Grievance, ECF No. 1-1, PageID.25-34.)

With regard to Defendant Ouellette, Plaintiff does not supply any supporting blood tests, but he claims that he informed her that his B-12 levels had been "on the low end" for the last five blood draws. (Grievance, ECF No. 1-1, PageID.16.) Nonetheless, he complains, she refused to do anything about it. (*Id*.)

With regard to Defendant Davis, Plaintiff alleges that the blood test results demonstrate his B-12 level was deficient, but Davis refused to take action because Davis insisted the results were normal. (Compl., ECF No. 1, PageID.8-9.) Plaintiff attaches the lab results to his complaint. (MDOC Lab Results, ECF No. 1-1, PageID.21-23.) With regard to Vitamin B-12,

the results were 205.2 picograms/milliliter.  Based on the reference range in the report of 239-931, the report indicates the results were "L" for low.

The test results beg the question: Do the B-12 lab results demonstrate a serious medical need.  Plaintiff relies on the fact that his result was outside the reference range listed on the report as the entire basis for claiming Davis should have done more than he did.  Plaintiff's reliance is misplaced.  Different laboratories use different reference values for vitamin B-12.  The Mayo Clinic, for example, uses a range of 180-914 picograms/milliliter.[8]  Johns Hopkins Medical Laboratories, on the other hand, uses a range of 211-946 picograms/milliliter.[9]  The National Library of Medicine lists the normal B-12 level for a healthy adult as anywhere from 200 to 900 picograms/milliliter.[10]  Thus, simple reference to Plaintiff's blood test results on the report does not demonstrate a serious medical need and neither Defendant Ouellette's nor Defendant Davis's failure to prescribe vitamin B-12 supplementation demonstrates deliberate indifference to a serious medical need.

## V.  Equal protection

The Equal Protection Clause prohibits discrimination by government actors which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.  *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).  The threshold element of an equal protection claim is disparate treatment.

---

[8] https://www.mayomedicallaboratories.com/test-catalog/Clinical+and+Interpretive/9156 (last visited Dec. 17, 2017).  The Mayo Clinic expresses the reference range in nanograms/liter.  Although the reference units are different, the actual value is the same.

[9] http://pds17.pathology.jhmi.edu/N/n.web?EP=N&MGWLPN=PDS15&URL=/MCGI/SEND1^WEBUTLTY (12981,1520)/1932192015 (last visited Dec. 17, 2017).

[10] https://medlineplus.gov/ency/article/oo3705.htm (last visited Dec. 17, 2017).

*Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'").

In this case, Plaintiff has not alleged disparate treatment. To the contrary, Plaintiff wants to be treated differently. He wants a different diagnostic test and a different supplement because he is Budddhist. He complains that Buddhist inmates and other inmates are treated the same, even though their respective beliefs and restrictions are different. Although treating similarly situated people differently may implicate the Equal Protection Clause, treating differently situated people the same way does not. Without a showing of different treatment, Plaintiff fails to state a claim for denial of equal protection.

## VI. First Amendment-free exercise and RLUIPA

The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend I. The right to freely exercise one's religion falls within the fundamental concept of liberty under the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, state legislatures and those acting on behalf of a state are "as incompetent as Congress" to interfere with the right. *Id.*

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, Plaintiff must establish that: (1) the belief or practice he

seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348,1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Plaintiff has sufficiently alleged his sincere beliefs regarding compliance with Buddhist dietary restrictions and prayer rituals. The next consideration is "whether the challenged practice of the prison officials infringes on the religious belief . . . ." *Kent*, 821 F.2d at 1224–25. A practice will not be considered to infringe on a prisoner's free exercise unless it "places[s] a substantial burden on the observation of a central religious belief or practice . . . ." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *see also Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015) (McKeague, J., dissenting) ("To violate the First Amendment, the diet must impose a substantial burden on the inmate's exercise of religion.").

"[T]he Supreme Court has made clear that the 'substantial burden' hurdle is high." *Living Water of Church of God v. Charter Tp. Of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007). "[A] 'substantial burden' is a difficult threshold to cross." *Id.* at 736. "'[A] 'substantial burden' must place more than an inconvenience on religious exercise.'" *Id.* at 739 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). A particular government action will not be considered a substantial burden merely because it "may make [the] religious exercise more expensive or difficult . . . ." *Living Water*, 258 F. App'x at 739.

A substantial burden stands in contrast to a *de minimis* burden on the free exercise of religion. Burdens that are less than substantial or isolated are not of constitutional dimension. *See Brown v. Graham*, 470 F. App'x 11, 15 (2d Cir. 2012); *Norwood v. Strata*, 249 F. App'x 269,

272 (3rd Cir. 2007); *Walsh v. Louisiana High Sch. Athletic Ass'n*, 616 F.2d 152, 158 (5th Cir. 1980); *Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999); *White v. Glantz*, No. 92-5169, 1993 WL 53098 (10th Cir. Feb. 25, 1993); *Greenburg v. Hill*, No. 2:07-CV-1076, 2009 WL 890521, at *8 (S.D. Ohio Mar. 31, 2009); *Al-Amin v. TDOC Com'r*, No. 3:12-cv-00249, 2012 WL 1231737, at *5 (M.D. Tenn. Apr. 11, 2012); *Crump v. Best*, No. 09-14323, 2010 WL 940037, at *3 (E.D. Mich. Feb. 4, 2010).

The First Amendment does not prohibit prison officials from imposing even substantial burdens on a prisoner's exercise of his religious beliefs where the prison officials' actions are "reasonably related to legitimate penological interests." *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To determine whether prison officials' actions are reasonably related to a legitimate penological interest, the Court must assess the officials' actions by reference to the following factors:

1. does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2. are there alternative means of exercising the right that remain open to prison inmates;

3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

The analysis of Plaintiff's RLUIPA claim parallels the analysis of his free exercise claim.[11]   In relevant part, the RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000cc-1(a).  The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7).  While this definition of religious exercise is broad, it does require that Plaintiff's religious beliefs be "sincerely held."  *See, e.g., Episcopal Student Foundation v. City of Ann Arbor*, 341 F. Supp. 2d 691, 700 (E.D. Mich. 2004) (citation omitted); *Lovelace v. Lee*, 472 F.3d 174, 187 n.2 (4th Cir. 2006) (citations omitted).  Likewise, the Supreme Court has indicated that "a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation."  *Holt v. Hobbs*, 135 St. Ct. 853, 862 (2015).  However, prison officials may not inquire into whether a particular belief or practice is "central" to a prisoner's religion.  *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (recognizing that "the truth of a belief is not open to question, rather the question is whether the objector's beliefs are truly held"); *Colvin v. Caruso*, 605 F.3d 282, 298 (6th Cir. 2010) (holding that the "touchstone for determining whether a religious belief is entitled to free-exercise protection is an

---

[11] The Eighth Circuit Court of Appeals has described the similarities and differences between free exercise and RLUIPA claims as follows:

> [W]hen faced with both a Free Exercise claim and a RLUIPA claim, a court must, as a threshold matter, inquire as to whether the prison has placed a "substantial burden" on the prisoner's ability to practice his religion.  [*Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).]  "Once it is determined that a regulation imposes a substantial burden on a prisoner, the review of that burden under the Free Exercise Clause differs from [ ] RLUIPA."  *Id.*  If the prisoner fails to put forth sufficient evidence that his ability to practice his religion has been substantially burdened, then the court need not apply the *Turner* test to the Free Exercise claim and the strict scrutiny test to the RLUIPA claim. *Id.*

*Gladson v. Iowa Dep't of Corrections*, 551 F.3d 825, 833 (8th Cir. 2009).

assessment of 'whether the beliefs professed . . . are *sincerely held*,' not whether 'the belief is accurate or logical.'").

The phrase "substantial burden" is not defined in RLUIPA. The Sixth Circuit Court of Appeals has relied upon the Act's legislative history to conclude that the term has the same meaning under RLUIPA as provided by the Supreme Court in "free exercise" decisions. *Living Water*, 258 F. App'x at 733-34. Accordingly, a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (citations omitted); *Cutter*, 544 U.S. at 720 (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise); *Marshall v. Frank*, 2007 WL 1556872, at *5 (W.D. Wis. May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)) (a substantial burden is one which renders religious exercise "effectively impracticable"). Similarly, if a policy requires a petitioner to "engage in conduct that seriously violates [his] religious beliefs" or face disciplinary action, then the burden is substantial. *Hobbs*, 135 S. Ct. at 862. Moreover, the fact that the petitioner is able to engage in other forms of religious exercise is not relevant to whether the burden is substantial. *Id.*

By the same token, a burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise," *see, e.g., Konikov v. Orange County, Florida*, 410 F.3d 1317, 1323 (11th Cir. 2005), or does not "pressure the individual to violate his or her religious beliefs." *Living Water*, 258 F. App'x at 734. Such conclusions recognize that RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or

constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761.

Under the First Amendment or under RLUIPA, Plaintiff must allege that his religious exercise has been substantially burdened. Plaintiff's contends that his religious exercise has been substantially burdened in three ways: first, his dietary restrictions limit his vitamin B-12 intake and the MDOC will not permit him to obtain vegan supplements; second, his daily religious rituals require purity that can only be achieved with scented religious oils; and third, the MDOC will not provide a PSA blood test for diagnostic purposes in place of a religiously prohibited digital rectal examination.

### A. Vegan supplements

Under the circumstances described in Plaintiff's complaint, the medical decision to not prescribe vitamin B-12 supplements is constitutionally permissible. But, that does not preclude a determination that denying Plaintiff the opportunity to obtain vegan vitamin B-12 supplements substantially burdens the exercise of Plaintiff's Buddhist beliefs.

Typically, over 90% of a person's vitamin B-12 intake comes from food that is not part of the vegan diet.[12] Plaintiff's B-12 level is naturally a product of the diet compelled by his religious beliefs. *See* n.2, *supra.* There are limited natural sources of Vitamin B-12 available to

---

[12] *See* Table 9-9 Food Groups Providing Vitamin $B_{12}$ in the Diets of U.S. Men or Women Aged 10 Years and Older, Continuing Survey of Food Intakes by Individuals, 1995, Institute of Medicine (US) Standing Committee on the Scientific Evaluation of Dietary Reference Intakes and its Panel on Folate, Other B Vitamins, and Choline, *Dietary Reference Intakes for Thiamin, Riboflavin, Niacin, Vitamin B6, Folate, Vitamin B12, Pantothenic Acid, Biotin, and Choline*, (National Academies Press (US), 1998)–(herein "*Dietary Reference*").

vegans.[13]  The other vegan compliant sources of vitamin B-12 are fortified foods such as cereals.[14]  It is unlikely that Plaintiff is able to control his intake of vitamin B-12 by diet.

Nor can Plaintiff control his intake of vitamin B-12 by supplementation.  The MDOC offers vitamin B-12 supplements as part of its standardized correctional facility store list, but the supplements are not vegan compliant.  According to LCF Business Manager Pat Popoff, the availability of vitamin B-12 at the store means Plaintiff cannot order vitamin B-12 from another vendor.  (Prisoner Kite, ECF No. 1-1, PageID.50.)  Business Manager Popoff and Defendant Johnson both forwarded Plaintiff's request regarding vegan supplements to other authorities: Popoff to the "Central Office" (*Id*.), and Johnson to "Correctional Facilities Administration" (Sept. 2, 2016 Correspondence, ECF No. 1-1, PageID.68).  It does not appear those authorities took action and, according to Defendant Johnson, if 30 days passed without a ruling, Plaintiff could consider his request denied.  (*Id*.)  More than 30 days have passed.

Plaintiff is faced with a choice: he can adhere to his religious beliefs or he can take the steps he believes are necessary to ensure his good health by either eating non-vegan foods or taking non-vegan supplements.  Thus, the facts alleged by Plaintiff suffice to state a claim that the MDOC has substantially burdened Plaintiff's free exercise of his Buddhist beliefs.

Whether the burden imposed by the MDOC is rationally related to a legitimate penological interest or is the least restrictive means of furthering a compelling government interest remains to be seen.  At this stage of the proceedings, however, Plaintiff has stated a claim for

---

[13] *Dietary Reference* p. 342 ("Unlike other B Vitamins, B$_{12}$ is not a normal constituent of plant foods except for certain algae.").

[14] "Vitamin B12 is generally not present in plant foods, bur fortified breakfast cereals are a readily available source of vitamin B12 with high bioavailability for vegetarians."  Vitamin B12 Dietary Supplement Fact Sheet https://ods.od.nih.gov/factsheets/VitaminB12-HealthProfessional/#en13 (last viewed December 20, 2017).

violation of his First Amendment free exercise rights and RLUIPA with respect to his inability to obtain vegan-compliant B-12 supplements.

Based on Plaintiff's allegations, Defendants Johnson, Curley, and Leach played an active role in denying his request for B-12 supplements free of animal by-products. Defendants Ouellette, Davis, and Russell, however, did not.

B. <u>Religious oils</u>

Prison restrictions on the possession and use of oils for prayer has been challenged as substantially burdensome many times, most often by Muslim prisoners. Typically, the challenge is not resolved at the first step of the analysis, with a finding that the burden is insubstantial, but at the next step, with a finding that the burden is justified. *See, e.g., Joseph v. Campbell*, 10 F. App'x 264, 266 (6th Cir. 2001) (legitimate safety and security concerns, such as ease of hiding contraband, and flammable, caustic, or toxic character of oils, justified restriction of inmate possession of prayer oils in Tennessee prison); *Munir v. Scott*, No. 92-1693, 1993 WL 465162 (6th Cir. Nov. 10, 1993) (legitimate safety and security concerns, such as risk of secreting contraband, flammability, danger of glass or metal containers, or the use of oils to escape restraints, justified total ban of religious oils in Michigan correctional facility); *Mustafaa v. Dutton*, No. 91-6292, 1992 WL 51473 (6th Cir. Mar. 18, 1992) (legitimate safety and security concerns, such as risk of secreting contraband and flammable, caustic or toxic character of oils, justified restricting possession of prayer oils in Tennessee prison). The "substantial burden" claims at issue in *Joseph*, *Munir*, and *Mustafaa* were considered only under the First Amendment Free Exercise Clause— they predated the enactment of RLUIPA.

Federal circuit courts considering prayer oil limits under RLUIPA, however, have reached the same conclusion: limits on in-cell possession and use of prayer oils are a minimally

restrictive means of furthering compelling safety and security interests. *Hodgson v. Fabian*, No. 08-5120, 2009 WL 2972862, at \*13 (D. Minn. Sept. 10, 2009) aff'd 378 F. App'x 592 (8th Cir. 2010); *Davis v. Flores*, 484 F. App'x 108 (9th Cir. 2012); *Alamiin v. Morton*, 528 F. App'x 838 (10th Cir. 2013). Circuit courts that have struck down prayer oil restrictions under RLUIPA have only done so where the safety and security concerns attendant to in-cell possession and use of prayer oils were not offered as justifications for the limit. See *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003) (court struck down total ban of prayer oil where the only justification offered was imposing an overall limit on the quantity of property, no particular safety or security concern with prayer oil); *Nance v. Miser*, 700 F. App'x 629 (9th Cir. 2017) (court struck down total ban where it was conceded that security was not at issue, but the court acknowledged the propriety of a ban of inmate in-cell possession and use).

Plaintiff attempts to overcome the safety concerns by declaring that the oils for which he seeks approval—oils offered in the Union Supply Direct Catalog (Compl. Ex. 12, ECF No. 1-1, PageID.62-66)—are safe because they do not contain alcohol or animal by-products. (March 2, 2015 Correspondence, ECF No. 1-1, PageID.54-55.) But, as Defendant Leach noted in his response, the manufacturer indicates that the oils are toxic and should not come in contact with the eyes or be ingested.[15] (Memorandum, ECF No. 1-1, PageID.52.) Thus, Defendant Leach offered the same rational and compelling justification that courts have relied upon to conclude that limiting in-cell possession and use of religious oils violates neither the First Amendment Free Exercise Clause nor RLUIPA.

---

[15] The manufacturer's website supports Defendant Leach's conclusion regarding the oils. http://www.religiousoils.com/ (last visited Dec. 20, 2017).

The Sixth Circuit has definitively determined that safety and security concerns are legitimate penological interests that justify restricting in-cell use and possession of prayer oils. Other circuit courts have reached a similar conclusion that safety and security concerns are sufficiently compelling to permit the restriction of in-cell use and possession of prayer oils under RLUIPA. Accordingly, Plaintiff's contention that the MDOC's restriction of his in-cell use of prayer oils violates the First Amendment Free Exercise Clause or the RLUIPA is without merit and properly dismissed.

C. <u>PSA blood test</u>

Based on Plaintiff's age, *see* n.5 *supra*, and the absence of any allegations suggesting that he suffered from prostate problems, denying Plaintiff a PSA blood test is not a substantial burden on the exercise of his Buddhist faith. Thus, Plaintiff has failed to state a claim under the First Amendment Free Exercise Clause or the RLUIPA relating to the PSA blood test.

## VII. The Religious Freedom Restoration Act

The Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, prohibits "[g]overnment" from "substantially burden[ing]" a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. In *Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that it was beyond the power of Congress to impose that burden on the States under the Fourteenth Amendment. *Id.* at 535. Accordingly, Plaintiff has no cause of action against state actors for violation of RFRA.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Ouellette, Davis and Russell will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will serve the complaint against Defendants Leach, Curley, and Johnson, but only with respect to Plaintiff's claim that the refusal to permit him to obtain vegan-compliant vitamin B-12 violates his rights under the First Amendment and RLUIPA.

An Order consistent with this Opinion will be entered.


Dated:   January 4, 2018                          /s/ Paul L. Maloney
                                                  Paul L. Maloney
                                                  United States District Judge